UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| TEKOA Q. TINCH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:21 C 50219 |
| ) | |
| TRICIA CORRIGAN, ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

On September 3, 2019, Plaintiff Tekoa Tinch, then a detainee at the Metropolitan Correctional Center ("MCC") in Chicago, swallowed a USB drive. Tinch has been in custody ever since, and was confined at the Winnebago County Jail from April 12, 2021 until May of 2022. Tich appears to believe that the USB drive remains stuck in his throat. In this lawsuit, he alleges that Tricia Corrigan, the Nurse Practitioner at the Winnebago County Jail, was deliberately indifferent to his need for medical care arising from ingesting the USB drive, in violation of 42 U.S.C. § 1983. Defendant Corrigan—who does not share Tinch's belief that the USB drive is still inside him—has moved for summary judgment [138]. Corrigan contends that Tinch has not shown she was deliberately indifferent to his condition or that her treatment of him was objectively unreasonable. For the reasons given below, the motion is granted.

**BACKGROUND**

**I.     Factual Background**

The following facts are construed, and all reasonable inferences are made, in the light most favorable to Tinch.[1] *See Christensen v. Weiss*, 145 F.4th 743, 748 (7th Cir. 2025).

---

[1] The court notes that Tinch cites exclusively to his complaint as evidence for almost half of his L.R. 56.1 statement of facts. (*See generally* Pl.'s SOMF [146]; Pl.'s Supp. SOMF [147-2].) He continues to rely on his complaint as evidence in his memorandum in opposition to Corrigan's motion for summary judgment. (*See generally* Pl.'s Resp. to Def.'s Mot. [145].) As this court advised Tinch in a September 22, 2025 order [150], generally, a plaintiff may not rely

On September 3, 2019, Tekoa Tinch swallowed a USB thumb drive while he was in the custody of the MCC; his reasons for doing so are unclear but ultimately irrelevant to this motion. (Def. SOMF [140] ¶ 5.) The USB thumb drive was rectangular in shape, an inch long and less than an inch wide. (Pl.'s Resp. to Def.'s SOMF [147-1] ¶ 6.) After swallowing the object, Tinch suffered severe ongoing throat pain, has coughed up blood, and has experienced vomiting, dry heaving, and sleep loss. (Def. SOMF ¶ 7.) He requested, and ultimately received, medical treatment for these symptoms multiple times while at the MCC, and did receive outside treatment at Thorek Hospital including an esophagram, x-ray, ultrasound, and laryngoscopy.[2] (Id. ¶ 8, 9.)

In February of 2021, almost a year and a half after he swallowed the USB drive, Tinch was transferred to Livingston County Jail ("Livingston"). His symptoms continued: Tinch continued to experience throat pain and difficulty swallowing. (Id. ¶ 9.) While at Livingston, Tinch received an x-ray which, he maintains, shows that the USB drive remains lodged in his throat. Thus, reading from the allegations in his complaint, he testified in his deposition that the x-ray showed an "eight millimeter linear radiopaque, foreign body object project over the low midline chest only seen on the AP," and that "it may be internal." (Tinch Dep. [141-1] at 31:11–22; Pl. Supp. SOMF [147-2] ¶ 3.) But apart from this testimony, there is no admissible evidence in the

---

on mere allegations or denials in his complaint when opposing a properly supported motion for summary judgment. *See James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020).

[2] It is unclear whether these tests led to any diagnosis. In her statement of facts, Defendant asserts that prior to Plaintiff's arrival in Winnebago, no cause for Tinch's pain had been identified by any previous testing, including these tests at MCC. (Def. SOMF ¶ 13.) The cited materials confirm that only obliquely: Tinch testified that he had undergone an endoscopy, x-rays of the throat and abdomen, an ultrasound, and a laryngoscopy by the time he arrived at Winnebago. (Tinch Dep. [141-1] at 35:8–36:18.) He was asked only about the results of the laryngoscopy, to which he responded: "I am aware that it found no, no major complication . . . but it, I believe it found some complications." (Id. at 36:10–18.) He was not asked about the other procedures. Tinch also testified that he was diagnosed with a swollen thyroid at MCC, and that "there were a few things that they had mentioned"; he could not recall all of them, but did not say that they confirmed the presence of a USB drive in his throat. (Tinch Dep. [141-1] at 29:10–18.) Corrigan herself did not testify that *no* diagnosis had been made prior to Tinch's arrival at Winnebago. She was, however, clear in stating that based on diagnostic testing after his arrival, she concluded that a USB drive was not stuck inside Tinch's throat. (Corrigan Dep. [141-3] at 40:10–18.)

record concerning the x-ray or the findings it purportedly supports. Tinch himself cites only his complaint as support for this reported diagnosis. (Pl.'s Supp. SOMF [147-2] ¶ 3.) He acknowledged at his deposition that his description was based on "nothing but the, the statement of the facts that were stated inside of this lawsuit in the initial complaint, that's it." (Tinch Dep. [141-1] at 32:8–33:4.) Tinch has provided no other support for this purported diagnosis.

The court, on its own review of the record, notes that Nurse James Pulliam ("Pulliam"), who treated Tinch at the Livingston County Jail, read into the record at his deposition a March 11, 2021 patient report describing the chest x-ray that Tinch received at Livingston, which showed that an "8 millimeter linear radiopaque foreign body projects over the low midline chest only seen on the AP view, may be internal or external to patient."[3] (Pulliam Dep. [141-2] at 26:12–17.) The "impression was no acute cardiopulmonary findings foreign body." (Pulliam Dep. [141-2] at 26:20-23.) Defendant has not explained the significance of this "impression," but Pulliam testified that it is "common knowledge" that objects external to the patients, like tubing, zippers, or buttons can be seen in an AP view, which would explain why a radiologist could conclude that the foreign body was external to Tinch. (Pulliam Dep. [141-2] at 27:12–28:16.) The best explanation of the diagnosis comes from this portion of Pulliam's deposition:

> Q. Okay. This is common knowledge in the medical profession, correct?
> A. Should be, yes.
> Q. Yes. And that is why it would be reasonable to conclude that the reason the radiologist noted it could be external to the patient is because this was an AP view, true?
> . . .
> A. Yes, I believe so.
> Q. Okay. So based on the radiologist's view of this chest x-ray, there was a foreign body noted, but the radiologist was saying in his notes he didn't know whether it was inside the patient or outside the patient, right?
> A. That would be my understanding, yes.

---

[3] As the court understands this term (unexplained by the parties), "AP" stands for an "anterior-to-posterior" projection, which is when the x-ray is projected into the front of the chest and exits at the back. Tafti & Byerly, *X-ray Radiographic Patient Positioning*, NAT. LIB. OF MED. (last updated Dec. 11, 2002), available at https://www.ncbi.nlm.nih.gov/books/NBK565865/.

(Pulliam Dep. [143-2] at 27:24–28:16.) There was no specific finding about whether there was indeed a foreign body found inside Tinch.

Unfortunately, neither Tinch nor Corrigan has submitted the exhibits cited in the deposition transcripts. The court is left only with Pulliam's largely hearsay testimony about what these documents, prepared by other treaters, said and what they may mean. *See* FED. R. EVID. 801. Assuming the underlying document meets the medical diagnosis exception to hearsay, Pulliam's reading of that document into the record at a deposition (rather than in connection with treatment or diagnosis) would not. FED. R. EVID. 803(4)(A) (the statement must be "made for—and [be] reasonably pertinent to—medical diagnosis or treatment"). The court declines to make findings based on documents that are themselves not in the record. In short, no admissible evidence establishes that Tinch had a USB drive stuck in his throat when the x-ray was taken.

It is undisputed that after the x-ray was taken, Tinch was referred to an outside gastroenterologist and had an endoscopy scheduled on April 26, 2021. (Pl.'s Resp. to Def.'s SOMF [147-1] ¶ 11.) According to Tinch, the appointment was scheduled in order for the specialist to remove the foreign object. (Tinch Dep. [141-1] at 31:11–22.) Again, however, Tinch cites only his own complaint as evidence that this was the purpose for the appointment. (Pl.'s Supp. SOMF [147-2] ¶ 4.) No other testimony or medical records establish this, and there is no evidence that any medical provider diagnosed Tinch as suffering from an internal foreign body. As more fully explained below, an endoscopy is a procedure in which a camera is inserted into the esophagus. But before the appointment took place, Tinch was transferred to Winnebago County Jail on April 12, 2021. (Def. SOMF ¶ 11, 12.)

This case is a challenge to the treatment that Tinch received while he was at Winnebago County. On April 13, 2021, the day after he arrived, Tinch submitted a written request for medical attention, explaining that there was something in his throat, and that he had been scheduled for a "rigid endoscopy" before being transferred to Winnebago. (Pl. SOMF ¶ 13, 14.) What followed is disputed by the parties. Tinch testified that in the months of April, May, and June, 2021 he "got

4

no treatment whatsoever" and was "completely ignored." (Tinch Dep. [141-1] at 77:20–78:7.) He testified that the only reason he was eventually given care was because he filed a lawsuit on June 1, 2021 (Tinch Dep. [141-1] at 78:11–13), but even then, the care he received was systematically delayed.

Contrary to Tinch's claim of zero attention for several months, the record shows that Defendant Tricia Corrigan ("Corrigan"), the Nurse Practitioner at Winnebago County Jail, saw Tinch on April 14, 2021, one day after he submitted his request for medical attention. (Def. SOMF ¶ 15.) Tinch reported at this appointment that he had previously swallowed a USB drive, that he was having pain in his throat and difficulty swallowing, and that he had an appointment to get the object removed. (*Id.*) Tinch testified that around that time he still "believe[d he] had a thumb drive stuck in [his] throat," but acknowledged that he also could have had an "unrepaired injury" to his throat as a result of the thumb drive. (Tinch Dep. [141-1] at 49:1–16.)

Corrigan reviewed at least some of Tinch's medical history on April 13, 2021. (*Id.* ¶ 14; Corrigan Dep. [141-3] at 44:14–20.) The scope of this review is unclear, but Corrigan had access to records of diagnostic testing and visits dating to the previous year. (Corrigan Dep. [141-3] at 40:5–18.) By the time Corrigan saw Tinch, he already had an esophagram, x-rays of his throat and abdomen, ultrasounds, and a laryngoscopy. (Def. SOMF ¶ 13.) Corrigan asserts that none of these tests resulted in a diagnosis for the cause of Tinch's pain. (*Id.*) Tinch disputes this, but he cites only his own assertion that the x-ray showed a foreign body in his chest that he needed removed—as noted, an assertion unsupported by admissible evidence. Tinch claims that Corrigan failed to make a request for additional medical records that would have confirmed a diagnosis of a foreign body. (Pl.'s Supp. SOMF [147-2] ¶ 13.) Again, however, neither side has submitted records of Tinch's medical history at other facilities, so there is no evidence of what these medical records (wherever they might be) would show.

In any event, it is undisputed that after Corrigan reviewed Tinch's medical history, she determined that he did not in fact have a USB drive stuck in his throat. (Pl.'s Supp. Resp. to Def.'s

SOMF [147-1] ¶ 14.) Such a thing would make little sense, Corrigan testified; she had never heard of an object like that being stuck in an individual's throat for one to three years. (Corrigan Dep. [141-3] at 54:6–13.) As for the "rigid endoscopy" that Tinch said he had scheduled, Corrigan noted that the routine procedure would be an upper endoscopy.[4] (Def. SOMF ¶ 16.) Tinch contends such a statement requires expert testimony[5] and disputes that a rigid endoscopy was not the appropriate test. Corrigan suggested that a detainee for whom a test had been ordered previously would have to again seek approval for such testing from officials at Winnebago County—but she also appeared to recognize that an order for an outside GI assessment issued at Livingston County remained valid at Winnebago. (*Id.* ¶ 17; Corrigan Dep. 48:3–15.) In any case, rather than automatically ordering the testing that Tinch requested, Corrigan informed Tinch that she would perform her own assessment. (Def. SOMF ¶ 16.)

Though she did not believe that a flash drive remained in Tinch's throat, Corrigan referred Tinch to an outside gastroenterologist on April 24, 2021 for a consult. The gastroenterologist, ordered an esophagram to "[r]ule out [a] foreign body versus somatization"—that is, the possibility that Tinch had a sensation of an object that was not in fact there. (Def. SOMF ¶ 19; Corrigan Dep. [141-3] at 71:7–22, 50:2 ("Yes, I did submit a request for a GI consult.").) Tinch disputes

---

[4] The difference between a rigid endoscopy and upper endoscopy is not explained in the record. From the court's own research, it appears that a rigid endoscopy uses a straight and solid tube to visualize the esophagus, while an upper endoscopy uses a flexible tube that can bend with internal pathways. Marine Veaudecrenne, *What are the differences between a flexible endoscope and a rigid endoscope?*, CODEO MED. (last accessed Nov. 3, 2025), https://codeo-medical.com/en/blogs/news/what-are-the-differences-between-soft-endoscope-and-a-rigid-endoscope?srsltid=AfmBOopWS07ZDnIoCow6sOmhD_Nwpzp3JqhPkEn2a8zqF3Ax4xGcMmb.

[5] Tinch disputes much of Corrigan's testimony that is based on her experience, including the descriptions of different diagnostic tests. He claims that they would need an expert to prove these kinds of facts. The court disagrees. FED. R. EVID. 602 allows a witness to testify to anything in their personal knowledge. Corrigan's testimony about her personal experience with patients swallowing foreign bodies, and her description of the diagnostic tests performed on Tinch—well within her knowledge and experience based on her certification as a nurse practitioner and time spent specifically as a nurse in a GI lab (Corrigan Dep. [141-3] at 11:19–12:13)—fall comfortably within the limits of Rule 602. Tinch otherwise provides no authority for excluding Corrigan's testimony.

that he was referred to an outside gastroenterologist (Pl.'s Resp. to Def.'s SOMF [147-1] ¶ 19), but then later asserts in his own statement of facts that Corrigan ordered a referral for an esophagram. (Pl.'s Supp. PSOF [147-2] ¶ 13.) The record also shows that Tinch received a "GI esophagram" at an outside hospital on July 9, 2021, pursuant to an order authorized by Corrigan. (Ex. E to Pl.'s Resp. to Def.'s SOMF [147-3] at 204.) Tinch notes that the esophagram was performed by a radiologist; it is not clear how this supports his contention that he was never referred to a GI for a consult.

Corrigan herself saw Tinch again on April 26, 2021, where she testified that he became disruptive, and eventually correctional officers—not Corrigan—made the decision to end the visit for Corrigan's safety. (Def. SOMF ¶ 18.) Tinch continued to file grievances stating that he had an object in his throat that required removal. One of those grievances, filed on April 29, 2021, stated that at the April 26, 2021 visit, medical staff told him his "medical concerns were all in [his] head." (Ex. D to Pl.'s Resp. to Def.'s SOMF [147-3] at 202.) He reiterated that he "want[s] this object from [his] throat removed," an MRI, and a "Rigid Endoscopy." (*Id.*) On May 26, 2021, Tinch requested to be seen by nurses other than Corrigan because she told him he was "hallucinating," and then stated again: "I want this object removed from my throat." (Ex. G to Pl.'s Resp. to Def.'s SOMF [147-3] at 210.) Corrigan denies telling Tinch that he was hallucinating and explained that she had instead provided Tinch with information about somatization disorder. (Def.'s SOMF ¶ 31.)

As previously established, Tinch eventually received an esophagram in July of 2021. (Def. SOMF ¶ 19.) In an esophagram, a noninvasive test, the patient swallows barium; as the barium passes through the esophagus and stomach, a radiologist can spot structural abnormalities and obstructions. (*Id.*) According to Corrigan, relying on the esophagram, the gastroenterologist diagnosed Tinch with esophagitis (inflammation of the esophagus), which Tinch does not dispute. (Pl.'s Resp. to Def.'s SOMF ¶ 19.) No USB drive was spotted. (Def. SOMF ¶ 21; Pl.'s Supp. SOMF [147-2] ¶ 14.)

According to Defendant, the gastroenterologist also ordered an endoscopy on or about July 21, 2021.[6]  (Def. SOMF ¶ 22.)  In an endoscopy, a camera is fed through the esophagus and stomach, which allows the gastroenterologist to visualize the inside of both.  (*Id.* ¶ 22–23.)  Tinch admits that he underwent an endoscopy in February of 2022.  (Pl.'s Supp. Resp. to Def.'s SOMF [147-1] ¶ 26; Pl.'s Supp. SOMF [147-2] ¶ 29.)  Tinch also admits that, based on the endoscopy, the gastroenterologist diagnosed him as suffering from gastroesophageal reflux disorder ("GERD"), a condition in which the stomach overproduces acid and causes heartburn.  (Pl.'s Resp. to Def.'s SOMF ¶ 26.)  He admits that this could have contributed to his symptoms.  (*Id.*)  No USB drive was seen in the endoscopy.  (Def. SOMF ¶ 29.)

At some point, although it is unclear from the record exactly when, Corrigan referred Plaintiff to the psychiatric department for evaluation of a possible somatization disorder.  (*Id.* ¶ 31.)  A person with a somatization disorder believes something is physically wrong, or has a physical sensation with no determined physical cause; such a belief can be rooted in anxiety or OCD.  (*Id.* ¶ 32.)  To target Tinch's recurring thought that he had a foreign body stuck in his throat, Corrigan prescribed psychotropic medications, including a low dose of Risperdal and Lexapro, as well as Omeprazole.  (*Id.* ¶ 33.)  Tinch disputes that he was given Risperdal or Lexapro, but only on the ground that "the cited material by the Defendant does not reference Risperdal or Lexapro."  (Pl.'s Resp. to Def.'s SOMF ¶ 33.)  The record adequately supports Corrigan's assertion, however; Corrigan testified that she prescribed Risperdal and Lexapro (Corrigan Dep. [141-3] at 89:2–7),

---

[6] Tinch disputes this fact, stating that the transcript actually suggests that Corrigan was not sure whether an endoscopy occurred.  (Pl.'s Resp. to Def.'s SOMF [147-1] ¶ 22.)  However, in the portion of the transcript Tinch cites, Corrigan is discussing whether she resolved Tinch's request for an MRI, not whether an endoscopy was performed.  In fact, the transcript confirms that she believed an endoscopy was performed.  (Corrigan Dep. [141-3] at 96:2–97:1.) ("Q. Do you recall ever having a conversation with Mr. Tinch about getting an MRI instead of an endoscopy? . . . A. Yes. . . . Q. [D]o you have any recollection of how . . . this issue was resolved? A. I would have to look to see where the timing of this [request] was with when he had the endoscopy done.")  Notably, despite his objection to this paragraph, Tinch later admits that he did have an endoscopy that resulted in a diagnosis.  (Pl.'s Resp. to Def.'s SOMF [147-1] ¶ 26.)

and Tinch admits he was given psychotropic drugs and that they improved his symptoms. (Pl.'s Resp. to Def.'s SOMF ¶ 33; Tinch Dep. 82:20-24 ("Q. What about the other medication . . . Omeprazole . . .? A. I believe that that helped to relieve some of the symptoms, ma'am.").)[7]

In May of 2022, Tinch was transferred out of Winnebago to the United States Penitentiary in Atlanta. (Def. SOMF ¶ 42.) Corrigan estimates that she met with Tinch in person approximately five times in total over the course of his stay at Winnebago. (Corrigan Dep. [141-3] at 38:17–39:8.)

## II. Procedural History

Plaintiff filed his original complaint pro se, which survived initial screening. (Order [9].) Since 2021, Plaintiff has been represented by counsel recruited by Judge Reinhard, who previously presided over this case. (*See Id.*) Plaintiff's Fourth Amended Complaint (the operative complaint) brings claims for deliberate indifference pursuant to 42 U.S.C. § 1983 against Defendant Gary Caruana ("Caruana"), the Sheriff of Winnebago County; Defendant Robert Redmond ("Redmond"), the Superintendent of the Winnebago County Jail; and Corrigan. Since then, Defendants Caruana and Redmond have been dismissed, and Defendant Corrigan has moved for summary judgment.

## DISCUSSION

## I. Legal Standard

Summary judgment is appropriate "if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is

---

[7] Tinch also testified that some of his symptoms improved when he *stopped* taking the medications. (Tinch Dep. 82:9–19 ("Q. And when did your symptoms improve? A. I believe when I was given that medication for a time, I mean, I was put on psychotropics . . . . But due to the psychotropics when I had stopped taking them, I believe I noticed a slight improvement.").) Whether the medications helped or hurt, Tinch can not, on this record, credibly deny that they were prescribed.

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The movant bears the burden of establishing that the summary judgment standard is met, and if the moving party does so, the opposing party must present evidence sufficient for a jury to find in their favor on all matters on which they bear the burden of proof. *Celotex*, 477 U.S. at 323.

## II. Analysis

The parties first dispute whether Tinch's claim arises under the Eighth Amendment's Cruel and Unusual Punishment Clause or the Fourteenth Amendment's Due Process Clause.[8] "While the Eighth Amendment applies to convicted prisoners, the Fourteenth Amendment applies to pretrial detainees." *Est. of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017). "The language of the two Clauses differs, and the nature of the claims often differs." *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). The court need not decide the issue, however, because summary judgment is appropriate regardless of which standard applies.

"The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody," and proscribes deliberate indifference to serious medical needs of prisoners. *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (citation omitted). To succeed on a deliberate indifference claim, Tinch must establish that he had an objectively serious medical condition, and that Corrigan was deliberately indifferent to that condition. *Christensen*, 145 F.4th at 752. Further, Corrigan's deliberate indifference must have injured Tinch. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022).

---

[8] Once again, Tinch cites only to his complaint for the assertion that he was a pretrial detainee at the time of the alleged incidents. His complaint brings claims under both amendments. (Complaint [87] ¶ 1 ("This is a civil action for damages and injunctive relief . . . arising from deprivations . . . of Plaintiff's rights under the Eighth and Fourteenth Amendments . . . .").) .

There is an objective and subjective component to a deliberate indifference claim. First, Tinch must show that he had an objectively serious medical condition. *Clemons*, 106 F.4th at 635. Second, Tinch must show that Corrigan acted with deliberate indifference when considering her subjective state of mind. To show deliberate indifference, Tinch must establish that Corrigan "knew of and 'consciously disregarded a serious risk to his health.'" *Id.* at 635. In other words, Corrigan "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Stockton*, 44 F.4th at 615 (citation omitted). Deliberate indifference can be established through inference from circumstantial evidence. *Christensen*, 145 F.4th at 752.

The Fourteenth Amendment requires government officials to "safeguard the health and safety of pretrial detainees." *Gonzalez v. McHenry Cnty., Illinois*, 40 F.4th 824, 827 (7th Cir. 2022). A Fourteenth Amendment claim for inadequate medical care looks similar to an Eighth Amendment claim, but a pretrial detainee need only "'show that the defendant's conduct was *objectively* unreasonable,' without any accompanying requirement to demonstrate, as would be the case in a claim brought under the Eighth Amendment . . . 'that the defendant was subjectively aware that [his conduct] was unreasonable.'" *McCann v. Ogle Cnty.*, Illinois, 909 F.3d 881, 886 (7th Cir. 2018) (citation omitted). In assessing whether there was a deprivation of Tinch's right to adequate medical care, the court first examines "(1) 'whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case' and (2) whether the defendants' actions were 'objectively reasonable.'" *Pittman ex rel. Hamilton v. Madison Cnty., Illinois*, 108 F.4th 561, 567 (7th Cir. 2024), *reh'g denied*, No. 23-2301, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), *and cert. denied*, 145 S. Ct. 1154 (2025) (citation omitted). In other words, the defendant must have intended to carry out the course of action that caused the injury, and that course of action must be objectively unreasonable from the perspective of a reasonable officer. *Id.* at 568.

Corrigan argues that she is entitled to summary judgment because (1) Tinch did not suffer from an objectively serious medical condition, and (2) there is no dispute that Corrigan was not deliberately indifferent to Tinch's medical needs or that she took an objectively unreasonable course of action.

With respect to the first prong of this test, the court concludes Tinch is in fact on solid ground. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (A "serious" condition under the Eighth Amendment is "one that a physician has diagnosed as needing treatment or 'one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"); *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002) (holding the same for the Fourteenth Amendment). Taking the facts in the light most favorable to Tinch, he had at one point swallowed a USB drive and was experiencing throat pain, difficulty swallowing, vomiting, and coughing up blood, all of which he reported to Corrigan. He was also ultimately diagnosed with esophagitis and GERD. A lay person would interpret these symptoms as requiring a doctor's attention and, thus, constitute an objectively serious condition. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("a lay person would recognize the need for a doctor's care to treat severe heartburn and frequent vomiting").

Corrigan's second argument is much stronger. The court agrees that Tinch has failed to produce evidence that creates a genuine dispute as to whether Corrigan was deliberately indifferent to his condition, or whether the course of action she chose was objectively unreasonable—defeating his argument under either an Eighth Amendment or a Fourteenth Amendment standard.[9] Tinch's claims on this issue are flatly contradicted by the record. For example, he asserts that Corrigan "took no steps at all to evaluate or review his prior medical history notes" (Pl.'s Resp. [145] at 4), "refus[ed] to listen to Plaintiff" (*id.* at 3), and "refused to

---

[9] The record shows that Tinch had been suffering from these symptoms for years, and the record contains allegations of treatment deficiencies at other facilities. In the case before this court, however, the issue is whether Corrigan was deliberately indifferent to his condition. Consequently, the court focuses only on her conduct at Winnebago.

12

consult with a physician." (*Id.* at 9.) He further argues that "[i]f a reasonable officer believed something was stuck in Plaintiff's throat, the officer would have started the process to take out the foreign object from the body." (*Id.* at 3.) But this argument ignores the obvious: Corrigan did *not* believe that something was stuck in Plaintiff's throat. Tinch does not argue that Corrigan failed to treat his GERD or esophagitis. He also does not argue that the testing that Corrigan authorized was insufficient to properly diagnose him or rule out foreign bodies. Instead, he insists she should have treated him for the condition that he himself believes existed: that a USB drive was stuck in his throat. As he sees things, Corrigan should have immediately sent him for a rigid endoscope per instructions from a previous facility, which are not in the record, to retrieve a USB drive, despite diagnostic tests showing no such item was present.

The record offers no evidence of deliberate indifference: Corrigan saw Tinch the day after he submitted his request. The court will assume that, at their first meeting, Tinch alerted Corrigan to his symptoms, told her that he had a previous diagnosis of a foreign body that was not in his medical records, and pointed out that he had been scheduled for an appointment for its removal. It is undisputed that Corrigan received and reviewed at least some of Tinch's medical records from previous facilities. (Pl.'s Supp. Resp. to Def.'s SOMF [147-1] ¶ 14 (admitting that Corrigan received and reviewed his medical records but asserting that she did not receive *all* medical records).) These records included x-rays of his chest and throat, laryngoscopies, and esophagrams, which would have shown a foreign body, had one been present Tinch acknowledges that the tests ordered by Corrigan were standard treatment for the issues he was suffering from and complaining of, but argues that he "went through almost, if not, all of the diagnostics Defendant proscribed at his previous facility." (Pl.'s Resp. [145] at 9.) But in the court's view, these circumstances only make Corrigan's determination that he did not have a USB drive or other obstruction that would require immediate removal all the more reasonable—the other facility had already performed tests that would have identified any obstructions to his throat or chest.

13

Further, it is undisputed that despite Corrigan's determination that there was no USB drive in his throat, *and despite the fact that he had already received extensive tests at the prior facility*, she nonetheless arranged for *yet another* esophagram to help detect obstructions. In the meantime, Corrigan prescribed psychotropic medication that she believed might help Tinch—and the record shows that to some extent, they did. Tinch also received an endoscopy to directly visualize his esophagus. No obstruction was found in the esophagram or endoscopy, but he was diagnosed with esophagitis and GERD, which could have caused his symptoms. Tinch's demand for a "rigid endoscopy"—a procedure which, according to the record, is rarely performed—lacks merit, considering the extensive testing that he did receive.

Based on this evidence, no reasonable jury could find that Corrigan both knew of and consciously disregarded a serious risk to Tinch's health. Nor could a reasonable jury find that her course of action was objectively unreasonable—particularly because the court's "task here is not to determine whether [Corrigan] acted consistently with the highest standards of the nursing profession or even whether her conduct might be deemed negligent." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 486 (7th Cir. 2022). This is not a situation, as Tinch argues, where Corrigan ignored the instructions of a specialist. Indeed, there is no evidence in the record of any instruction from a specialist that Corrigan ignored. And Corrigan did refer Tinch to a GI specialist and authorized the testing that specialist suggested. *Cf. Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016), *as amended* (Aug. 25, 2016) ("One hint of such a departure [from the standard of care] is when a doctor refuses to take instructions from a specialist.")

Tinch also argues that Corrigan should not have "dismissed" his claims by suggesting that they were "not real." Even if Corrigan told him that he was "hallucinating," the record shows that she nevertheless continued to treat his symptoms, referred him to a GI, and authorized diagnostic testing. Telling a patient that he is hallucinating could suggest deliberate indifference if the provider then continued to ignore claims of pain, but that is not what happened here. The record shows that Corrigan did not ignore Tinch or fail to provide treatment for either his physical or

14

psychological symptoms. Plaintiffs rely on *Miller v. Larson*, 756 F. App'x 606 (7th Cir. 2018) (per curiam) as a comparable case, but again, unlike Corrigan, the doctor in *Miller* ignored the patient after expressing disbelief concerning the patient's symptoms. *Id.* at 610 (vacating dismissal, at initial screening, of Eighth Amendment claim where plaintiff alleged the doctor told him his symptoms of nausea and vomiting from being treated with the wrong medication were in his head and then "brushed him off and gave no further care").

Finally, Tinch points to the delay in treatment as evidence of deliberate indifference and objective unreasonableness. For purposes of this motion, the court assumes that Corrigan's decision to not immediately refer him for a rigid endoscope per his request, and to instead conduct her own assessment and refer him for a consult and esophagram, caused the delay in his treatment—not the transfer to a new facility right before his appointment. Even so, any delay that Corrigan's decision caused does not raise an inference of deliberate indifference to Tinch's condition. "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Reck*, 27 F.4th at 483. The court can consider the seriousness of the condition and the ease of treatment; "[e]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Id.*

Corrigan did immediately evaluate Tinch after his complaint, reviewed his medical history and previous tests, and determined, first, that he did not have a USB drive in his throat. The USB drive not only was Tinch's chief complaint, but a condition that would have required prompt attention and prompt care. *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (per curiam) (a few days delay in treating "serious, readily treatable condition" can support a deliberate indifference claim, where plaintiff was attacked in sleep, injured his head and eyes, and left for days while bleeding, vomiting, and losing vision under guard's watch). Corrigan promptly sought consultations with specialists for further testing, and in the meantime, prescribed psychotropic

15

medications for his symptoms. There is no evidence that Corrigan knew of and consciously disregarded a risk to Tinch's health in seeking consultations and diagnostic testing instead of immediately granting his request for a rigid endoscopy. *See Reck*, 27 F.4th at 483–84 (affirming finding that doctor did not act with deliberate indifference in seeking consultations before ordering surgery for fistula, resulting in a few extra months of waiting, and in prescribing medications while awaiting consultations with specialists). There is also no evidence that this course of treatment was objectively unreasonable, especially considering Tinch's ultimate diagnosis of esophagitis and GERD. Again, Tinch does not argue that the treatment of his esophagitis and GERD was constitutionally deficient.

The other cases cited by Plaintiff in support of his claims are readily distinguishable.[10] There is no evidence that Corrigan ignored a specialist's recommendation here, that she personally delayed any appointments, or that she declined treatment. *Compare Petties*, 836 F.3d at 731–33 (reversing summary judgment for prison physicians who failed to immobilize ruptured tendon for six weeks despite specialist's testimony that this was essential, delayed appointment with specialist, refused to order surgery due to "cost," and ignored specialist's recommendation for physical therapy); *Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011) (reversing summary judgment for medical officials who ignored, for ten months, prisoner's request for his rheumatoid arthritis medication); *Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999) (reversing summary judgment

---

[10] Plaintiff cites *Estelle v. Gamble*, 429 U.S. 97 (1976), saying that the Court found a material fact issue as to whether the plaintiff, who was provided only ice and painkillers for a suspected fracture, had established deliberate indifference. To the contrary, the Court in *Estelle reversed* reinstatement of a complaint in a deliberate indifference case against defendant doctor, observing that

> whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.

*Id.* at 107. The court then remanded for a separate determination for claims against other prison officials.

for prison doctor who needlessly ignored plaintiff's painful and debilitating for five days, did not refer him to a specialist for seven months, and then ignored the specialist's recommendation); *Greeno*, 414 F.3d 645 (vacating summary judgment for doctor where plaintiff, suffering from heartburn and vomiting for years, was not sent for an endoscope, despite multiple notations by doctors noting that one was needed).

True, the mere fact that a plaintiff is receiving *some* treatment does not preclude a finding of deliberate indifference. *Id.* at 653–54. Deliberate indifference does, however, require a showing of treatment "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition. *Id.* at 654. Tinch not only received treatment but presented no evidence from which a jury could infer that it was so blatantly inappropriate as to constitute deliberate indifference as required for an Eighth Amendment claim. Nor has he shown that Corrigan undertook an objectively unreasonable course of action, as required for a Fourteenth Amendment claim.[11]

## **CONCLUSION**

Corrigan's motion for summary judgment [138] is granted. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

ENTER:

Dated:  November 5, 2025

_____
REBECCA R. PALLMEYER
United States District Judge

---

[11] Tinch also argues that Corrigan failed to comply with this court's order requiring the parties to certify good faith settlement efforts before filing dispositive motions. (Pl.'s Resp. [145] at 10, citing Order [127].) Corrigan responds that she made a settlement demand to which the Plaintiff did not respond until after her motion was filed. The court agrees that Corrigan should have made such a certification together with her original motion, but nevertheless finds that the Plaintiff has not been prejudiced, that Corrigan has now complied with the order (*see* Defendant's Reply [148] at 13), and that she is entitled to summary judgment.